Roscoe A. DYKMAN  *v.*  Kathryn D. DYKMAN

CA 06-22                                                253 S.W.3d 23

Court of Appeals of Arkansas
Opinion delivered March 14, 2007

*Worsham Law Firm, P.A.*, by: *Richard E. Worsham*, for appellant.

*J. Sky Tapp*, for appellee.

JOHN MAUZY PITTMAN, Chief Judge. This is an appeal from a divorce decree. The appellant is a doctor of psychology and the appellee is a psychiatrist. Appellant is eighty-five years of age and appellee is fifty-two. The only issue on appeal is whether the trial court's award of alimony to appellee was proper in light of appellant's advanced age. We affirm.

A grant of alimony is an issue within the sound discretion of the chancellor that will not be disturbed on appeal absent an abuse of discretion. *McKay v. McKay*, 340 Ark. 171, 8 S.W.3d 525 (2000). Although many factors are considered in setting the amount of alimony, the primary factors are the need of one spouse and the ability of the other spouse to pay. *Mitchell v. Mitchell*, 61 Ark. App. 88, 964 S.W.2d 411 (1998). Ordinarily, fault or marital misconduct is not a factor in an award of alimony. *Id.* However, fault and misconduct will be considered when it meaningfully relates to need or ability to pay. *Jones v. Jones*, 22 Ark. App. 267, 739 S.W.2d 171 (1987).

Here there was evidence that appellee was employed for several years by a consulting firm in Dallas and delivered much of her considerable earnings to appellant, in amounts up to $12,000 per month, with the express understanding that he would use these funds for marital purposes, such as reduction of debt on the parties' real property. There was also evidence that, during this time, appellant was planning to divorce appellee and assume an open relationship with one or more young women, to whom he gave substantial gifts of automobiles, clothing from Victoria's Secret, other gifts paid for with marital assets, and several checks for many thousands of dollars.

An exhibit titled "Cash and ATM Withdrawals by Roscoe Dykman and Checks to Chinese Women" shows scores of checks were regularly written between 1999 and 2002, most of which are in the range of several hundred dollars at weekly or biweekly intervals. Other checks are for exceptional amounts, including an automobile purchased for Chenghua Wang in 1999, a check in the amount of $7000 to Chenghua Wang in 2000, checks to Cheng-hua Wang for $1500 and $1000 in 2001, and a check to Ling Ling Zhang in 2002 in the amount of $11,000. Appellant denied that his relationship with these women was anything other than platonic

and asserted that the checks were merely short-term loans. However, his testimony is belied by the following letter written by appellant in 2001:

> Dear Lingling,
>
> This may be the last letter I ever write you, but there are some things I need to say. First, trust is a two-way street, my trust in you and your trust in me. Neither of these conditions were met in our relationship and they could have been had things been taken one step at a time. I needed to get to know you over a period of several months and you needed to get to know me over the same length of time. No one goes out and gets a divorce and marries someone else without knowing them. I thought that as I got to know you better that our relationship would improve in the same way that my relationship with Chenghua improved. But even that did not last. She wanted to have children and I did not.
>
> A few words about my wife. I have told you the kind of relation we have. She is just company sometimes and nothing more. I will divorce her once her court case is settled. I will be called as a witness in this settlement, mainly to testify to the fact that her disability has ruined our relationship.... I will continue to see her once in a while until the divorce is finalized (no sex). She believes that I will not leave her even though I have told her I intend to do this. I have spent millions of dollars on her and on property that both of us own jointly. A divorce at this moment, and I have thought about doing it, would result in a huge financial loss. It is important that she gets her practice up and going again before the final papers are filed.

In addition to using marital assets to fund his extramarital affairs rather than pay debt on marital property, appellant forged appellee's signature to obtain a second mortgage on one of their properties without her knowledge. He also fraudulently forged appellee's name to tax returns.

The evidence that appellant placed a snake in a box on appellee's driveway with a note saying "Die Bitch" is evidence of fault that cannot properly be considered in an award of alimony. Likewise, appellant's moral fault for his extramarital liaisons is not a legitimate consideration in an award of alimony. However, we think that appellant's diversion of marital funds to these young women, meaningfully relates to appellee's need for alimony be-

cause appellee had a right to believe her substantial monetary contributions to the marriage were being employed for marital purposes instead of funding appellant's courtship of several young women through lavish gifts. As a result of this diversion of marital funds, appellee does not have available the marital assets that she believed were being paid for by her contributions. Instead, at a time when she is attempting to establish a psychiatric practice, appellee faces bankruptcy.

■■ Appellee's attempt to establish her own psychiatric practice, rather than working as an employee, was engendered by a vocal impairment; appellee sustained an injury in 1999 that caused neurological damage and dysphonia, a disorder causing speech to be interrupted, strained, or garbled. She was subsequently terminated from her employment. Appellee's injury makes her tire easily when talking, and her speech becomes progressively more difficult to understand as she tires. The trial judge expressly found that appellee's speech was difficult to understand, limiting her ability to practice psychiatry. Her endurance is limited, and we think her plan to establish her own practice in order to control the amount and type of work that she does in light of her injury is a reasonable one. Appellee testified that she currently has no income but that she anticipates that her psychiatric practice will become self-supporting within a short period of time. Here, appellant's financial misconduct directly relates to appellee's need, and we think that it can properly be considered in awarding alimony. Finally, with regard to appellant's argument that it is unfair to order "an eighty-five year old gentleman" to pay alimony in an amount that would require him to seek further employment, we note that appellant was employed at the time of the hearing and that the $1023 in monthly alimony awarded was well within his ability to pay. Although appellant testified that his job was being terminated and that he would be unable to find another at his advanced age, we think that appellant has demonstrated that he retains a considerable amount of vigor and ability, and the alimony award is subject to revision in the event of changed circumstances.

Affirmed.

HART and BIRD, JJ., agree.